**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| SEYED MOOSAVI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 03-JEO-2165-W |
| | ) | |
| THE BOARD OF TRUSTEES OF | ) | |
| THE UNIVERSITY OF ALABAMA, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This matter is before the court on the motion of the defendant Board of Trustees of the

University of Alabama (hereinafter "the defendant" or "the University") for summary judgment

on the claims of the plaintiff (hereinafter "the plaintiff" or "Moosavi").  (Doc. 17).[1]  Also before

the court are various motions filed by the plaintiff to strike certain arguments and evidence

offered by the defendant.  (Doc. 25-27 & 38).  Upon consideration, the court finds that the

motion for summary judgment is due to be granted and the motions to strike are granted, except

to the extent the plaintiff seeks to strike the defendant's factual statement in its brief.

**I. BACKGROUND**

**A.  Procedural History**

The plaintiff filed his complaint in this case on August 5, 2003.  (Doc. 1).  He alleges he

was terminated in violation of Title VII of the Civil Rights Act of 1964, as amended, and Title

42, United States Code, Section 1981.  Specifically, he contends that he was terminated because

of his race, religion, and national origin.  The University answered the complaint (doc. 2) and has

---

[1]References to "Doc. __" are to the documents as numbered by the clerk of court in the court's record of the case.

denied the plaintiff's allegations.  It filed its motion for summary judgment on June 9, 2004.

Included with the motion (doc. 17) was an eighty-nine page memorandum brief (doc. 18),

affidavits (doc. 19), and two volumes of evidentiary submissions (doc. 20 & 21) in support of the

motion.  On July 14, 2004, the plaintiff moved to strike various portions of the defendant's

submissions[2] (doc. 25-27) and responded to the defendant's motion for summary judgment with a

103 page brief (doc. 28) and two volumes of exhibits (doc. 29).  On July 20, 2004, the plaintiff

filed an amended response.  (Doc. 33).  The amended response was necessary because one of the

plaintiff's witnesses disagreed in part with testimony reflected as hers, despite her prior

assertions to the plaintiff's counsel, in an affidavit that she had not yet approved or signed when

the plaintiff filed his response.  (Doc. 32).  Therefore, the amended response reflected alterations

to her affidavit both in the affidavit itself and in references to the substance of her affidavit in the

text of the plaintiff's brief.  The defendant filed a reply to the plaintiff's response on August 12,

2004, along with additional evidence in support thereof.  (Doc. 36 & 37).  Thereafter, the

plaintiff filed a motion to strike the defendant's reply and the documents offered in support

thereof.  (Doc. 38).

**B.  Facts**[3]

   **1.  Moosavi's Employment with the University**

The plaintiff is Iranian-American and a practicing Muslim.  (Moosavi Dec. at ¶ 1).[4]  In

---

[2]The court will address the bases for the plaintiff's motions to strike herein.

[3]The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff.  They are the "'facts' for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)."  *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[4]Moosavi's declaration is located at document 29, tab 1.

1981, he obtained a B.S. degree in architectural engineering from Southern Polytech University. (Moosavi Dep. at pp. 46-48).[5]   In 1989, the plaintiff became employed with the University as a part-time temporary instructor ("PTTI") to teach three to five classes in the math department. (Moosavi Dec. at ¶ 3; Moosavi Dep. at pp. 75-77).

The math department is one of 22 departments within the College of Arts and Sciences at the University.  It employs tenured or tenure-track faculty who perform teaching, research, and service.  These faculty members usually teach undergraduate (Math 125 calculus and above) and graduate level math courses.  The department also teaches introductory level math courses (Math 005 to Math 121) to almost 4,000 University students each year.  To meet all its teaching obligations, the department also employs full-time instructors ("FTTIs"), part-time instructors ("PTTIs"), and Graduate Teaching Assistants ("GTAs").  (Wu Aff. at ¶ 5).[6]

The GTAs, PTTIs, and FTTIs have different duties and receive varying types of compensation and employment arrangements.  GTAs are University graduate students who are given tuition assistantships and stipends while they are enrolled, and they teach undergraduate level math courses.  As students, they have access to the student health center and other University perks.  The GTAs primarily teach introductory level math courses, and are usually assigned two courses per semester.  (Queen Aff. at ¶ 6).[7]  Although there are exceptions, the math department's graduate teaching assistantships in the last five years have primarily been awarded to graduate students who are enrolled in the math department's graduate program

---

[5]Excerpts from Moosavi's deposition are located at document 29, tab 2 and at doc. 20.

[6]Wu's affidavit is located at document 19 in the court's record of the case.

[7]Queen's affidavit is located at document 19 in the court's record of the case.

seeking either a master's degree ("MS") or doctoral degree ("Ph.D.") in mathematics. (Queen Aff. at ¶ 6; Wu Aff. at ¶ 7). Moosavi has been one of those exceptions. He has always been enrolled as a student in the College of Education. (UA-2786-2-2786-11).[8] Over the last decade, Moosavi has completed five graduate level math courses taught in the math department, earning at least 15 credit hours of mainly "topics" courses. (UA-2786-2-2786-11). In comparison, master's level students in mathematics who are awarded GTAs generally complete at least 30 credit hours in graduate level mathematics. (Laurie Aff. at ¶ 10).[9]

The PTTIs are hired one semester at a time and paid according to the number of courses they teach. Unless they teach four courses, they receive very few benefits compared to other University employees. (Queen Aff. at ¶ 5). Moosavi was employed as a GTA for the last six of his eight years teaching in the math department before he was hired as an FTTI. (Queen Aff. at ¶ 5).

The most competitive position of these three types of employees in the math department is the FTTI position, which carries with it a higher salary, health insurance, and other benefits. Unlike other faculty positions in the math department, the FTTI positions are neither tenured nor tenure-earning positions. Instead, individuals hired into these positions are given appointment letters for either one or two year terms, with the possibility of renewal for the same amount of time of the original appointment term. Once the appointment has been renewed once, the appointment expires. The appointment letter explicitly states that it does not convey any right or expectation of continued employment beyond the time stated in the appointment letter. For an

---

[8]The University's Bates stamped exhibits are located at document 21 in the court's record of the case. Document 21, Part I contains documents numbered UA-0007-0287. Document 21, Part II contains documents numbered UA-0288-11901.

[9]Laurie's affidavit is located at document 19 in the court's record of the case.

4

FTTI to remain employed at the University beyond the time stated in his or her appointment letter, he/she must reapply for the position and compete among the applicant pool for the position.  (Queen Aff. at ¶ 7; Freeman Aff. at ¶ 5).[10]

The FTTI's job responsibilities are significantly different from that of the GTA and PTTI, who are generally only responsible for teaching courses.  An FTTI serves as a course captain, serving in a lead position for one of the introductory level math courses, and is assigned a variety of administrative responsibilities.  The duties involved in being a course captain include: planning and organization of the course; writing the syllabus for the course; planning and developing the homework assignments for the course; writing the departmental exams for the course; writing the final exam for the course; writing exam keys with grading schemes for all versions of the exams for the other FTTIs, PTTIs, and GTAs to use in grading the exams; orienting all people who are teaching the course in an initial pre-term course meeting; planning and conducting course meetings throughout the term with all individuals who are teaching the course; communicating effectively with those teaching the course; and overseeing the performance of and assisting the individuals who are teaching the course.  (Queen Aff. at ¶ 10).

Between 1989 and 1999, Dr. Wei Shen Hsia served as chair of the math department. (Allen Dep. at p. 9).[11]  Also during that time, Dr. Paul Allen served as Director of Undergraduate Math Programs.  (Allen Dep. at p. 10).  One part of Dr. Allen's job was to oversee the Introductory Math Program, which is the program that employs FTTIs, PTTIs, and GTAs to teach the lower level math courses.  (Allen Dep. at p. 11).  While Dr. Allen was in charge of the

---

[10]Freeman's affidavit is located at document 19 in the court's record of the case.

[11]Excerpts from Allen's deposition are located at document 20; document 29, tab 10; and document 37 in the court's record of the case.

introductory level math program, he and Dr. Hsia would recommend individuals for teaching

positions.  (Allen Dep. at p. 11).  They did not use a search committee comprised of other faculty

members from the mathematics department.  (Laurie Aff. at ¶ 4).

Moosavi was first hired in 1989 by Dr. Allen to teach introductory level math courses as a

PTTI.  (UA-00437).  In 1992, Moosavi entered graduate school and in Spring of 1993 was

admitted to the master's degree program in secondary education-mathematics in the College of

Education.  (UA-2786-3 & 4; UA-02579).  Moosavi taught introductory level math courses as a

GTA from Spring 1992 until Fall 1993.  (UA-00422-423, 425, 427-428).  In December of 1993,

he obtained his master's degree in math education.  (UA-2786-4).  He was then hired as a PTTI

in Spring 1994.  (UA-00420).  In the Fall of 1994, Moosavi once again entered graduate school,

this time to seek a doctorate from the College of Education in Educational Research.

(UA-02543; Moosavi Dec. at ¶ 6; Moosavi Dep. at p. 93).  The math department once again

awarded him an assistantship, and Moosavi taught courses in the math department as a GTA

from Fall 1994 through Spring of 1998.

Moosavi continued working as a GTA/PTTI from 1994-1998 in the math department.

(Moosavi Dec. at ¶ 6; Moosavi Dep. at pp. 95-97).  In 1998, Moosavi applied for and received a

two year contract for a full time temporary instructor ("FTTI") position.  (Moosavi Dec. at ¶ 8).

Before he was hired as a FTTI, effective August 16, 1998, Moosavi unsuccessfully applied at

least twice for FTTI positions in the math department.  The reason he was not selected for the

FTTI positions on those prior occasions was because Dr. Allen concluded that the other

applicants in the pool at that time were more qualified and had more experience.  (Allen Dep. at

pp. 75-76).

In the last year of Dr. Allen's and Dr. Hsia's ten years of leadership in the math department, Moosavi was hired for a FTTI position, effective August 16, 1998.  Moosavi's appointment was for a two-year academic period "with the possibility of renewal."  The appointment letter stated that this appointment was a "temporary appointment which, by definition, is not tenure-earning."  (Moosavi Dep. at Ex. 16; Moosavi Dep. at pp. 258-60).

Moosavi's FTTI contract expired May 16, 2002.  (Moosavi Dep. at Ex. 17).  He did not receive a new appointment as an FTTI, and that decision by the University is the basis for the action before this court.  Moosavi had not by that time obtained his doctorate within the amount of time expected of doctoral candidates at the University (seven years).  (Wu Aff. ¶ 7).  He then reapplied to graduate school in the College of Education on May 16, 2002, and was officially accepted on July 8, 2002.  (UA-2537-38).  Since August 16, 2002, he has worked as a GTA in the College of Education.  (UA-2543; UA-2537; UA-2786-2-2786-11; UA-00382-83).

## 2.  Moosavi's Position as an FTTI

From the time he was hired until 1998, Dr. Paul Allen was the director of the introductory math department and Moosavi's supervisor.  (Allen Dep. at pp. 10, 18).  While under Allen's supervision, Moosavi taught Math 121 in the Fall of 1998 and Spring of 1999, but he was not the course captain until Fall 1999, and was, therefore, not responsible for writing the four tests and one exam for the other Math 121 instructors to use in their classes.  (Moosavi Dep. at pp. 171-72; Queen Aff. at ¶ 10 and ¶ 12; Laurie Aff. at ¶ 12).

In Fall 1998, several faculty members in the math department asked Dr. Zhijian Wu to consider assuming the position of chair of the math department, since Dr. Hsia was stepping down after Spring 1999.  The math faculty recommended Dr. Wu for the department chair

position over Dr. Allen and Dr. Dick Brown.  (Wu Dep. at pp. 40-42).  Consequently, effective

August of 1999, Dr. Wu was named chairman of the Mathematics Department.  (Wu Dep. at p.

23).  Dr. Allen stepped down as Director of the Undergraduate Math Program in May 1999.

(Allen Dep. at p. 77).

      In Fall of 1999, after Dr. Allen was no longer his supervisor, Moosavi became course

captain for Math 121.  In his first year as course captain, Moosavi did not have any other FTTIs

or faculty teaching Math 121 under him; he only had PTTIs and GTAs assigned to him.  (Queen

Aff. at ¶ 12).  In May 2000, Dr. Wu recommended renewal of Moosavi's position for a two-year

period to end May 2002.  Dr. Wu's decision to recommend renewal for Moosavi was consistent

with the math department's practice of reappointing FTTIs when they were in the second year of

a two-year appointment that allowed for renewal.  (Wu Aff. at ¶ 16).  Dr. Wu had not reviewed

any of Moosavi's Math 121 exams at that point and, because no other FTTI or faculty member

had taught under him, Dr. Wu had little information on Moosavi's performance as a course

captain.  (Wu Aff. at ¶ 16).

      Moosavi's May 2000 appointment letter did not offer any possibility of renewal.  Instead,

it stated that the appointment was temporary, and did "not convey any right or expectation of

continued employment after the time specified above."  (Moosavi Dep. at pp. 258-60 and Ex.

17).

      In June 2000, the math department hired Gail Queen.  She received a two-year renewable

contract as a FTTI.  She was also asked to assume the duties of the Interim Director of

Introductory Mathematics.  (Queen Dep. at pp. 20-21).  Queen's job was to manage the

administrative details of the introductory program.  (Queen Aff. at ¶¶ 3, 4).  When Queen was

hired, Dr. Wu told her that improving the quality of every aspect of the Introductory Mathematics Program was a priority. (Wu Aff. at ¶ 4). Consequently, Ms. Queen implemented bi-weekly meetings for the instructors; a formalized proofing/copying deadline schedule; a requirement that course captains turn in test statistics; and a training program designed to help the GTAs improve their teaching skills. She also wrote a handbook for the instructors. (Queen Aff. at ¶ 11 e and f).

### 3. The 2002 FTTI Positions

When Dr. Wu became chair of the department, Dr. Hsia advised him to use search committees to select the FTTIs. (Wu Aff. at ¶ 9). In March of 2002, Dr. Wu appointed the following faculty to a search committee to determine who would be recommended to the Arts & Sciences Dean's Office for the six open FTTI positions. The committee was made up of Dr. Zhijian Wu, Dr. James Wang, Dr. Frank Roehl, and Dr. Cecelia Laurie. (Wu Dep. at 318, 319, 328).[12] Dr. Wu and Queen drafted an advertisement for the 2002 FTTI positions. (Wu Dep. at 164-65). The advertisement stated that applicants should have "A Master's Degree with a minimum of 18 hours in graduate level Mathematics" and that "A Master's degree in Mathematics is preferred."[13] (UA-01510). After approval from the Dean's office, the advertisement was placed in newspapers and on the internet. (Wu Dep. at pp. 179, 195-96).

In early April 2002, the selection committee met to determine which applicants they would invite to interview. (Wu Dep. at pp. 329, 333-34; Laurie 30(b)(6) Dep. at p. 28;[14] Roehl

---

[12]Excerpts from Wu's deposition are located at document 20 and at document 29, tab 3, in the court's record of the case.

[13]The ad that was used when Moosavi was first hired as a FTTI in 1998 did not state that a Master's degree in Mathematics was preferred. (UA- 01121-1122).

[14]Dr. Laurie testified both on her own behalf and on behalf of the University as its 30(b)(6) representative. Excerpts from Laurie's 30(b)(6) deposition are located at document 20 and at document 29, tab 6 in the court's record of the case.

Dep. at p. 43).[15]  Dr. Wu informed the committee that they would select nine individuals to interview for the six available positions.  (Roehl Dep. at p. 44).  Queen received the applicant information and compiled their reference letters, resumes, and applications in a file as she received them.  She then gave the committee the files.  (Queen Dep. at p. 114).

The committee selected nine individuals to interview and sent them letters informing them of their interview time and instructing them to be prepared to "teach the problem set . . . enclosed . . . as if you were addressing students."  (Doc. 29 at Ex. 25).  Twenty to twenty-five minutes of the interviews were spent on working the aforementioned problem set.  (Queen Dep. at pp. 82-83).  During this portion of the interview, Dr. Fisher and Queen played the role of students and asked questions while the interviewees taught the problem set.  (Laurie Aff. at ¶ 17; Queen Dep. at pp. 100-01; Fisher Dep. at p. 94; Khalilian Dep. at pp. 64-65; Kaddoura Dep. at p. 45).[16]

### 4.  The Interview Process

Prior to the interviews, the committee asked Queen to provide them with an overview of the applicants with whom she had experience.  The committee discussed the applicants' math background and their capability of being a course captain.  (Laurie 30(b)(6) Dep. at p. 164; Wang Dep. at pp. 57-58).  Moosavi submitted his application for the 2002 FTTI positions along with five letters of recommendation.  (Wu Dep. at pp. 278-81; Doc. 29 at Ex. 26, 27, 28, 46, & 47).  Initially, the committee had some question about whether Moosavi had completed the 18 hours of math course work required for the position.  Ultimately, however, at least part of the

---

[15]Excerpts from Roehl's deposition are located at document 20 and at document 29, tab 15 in the court's record of the case.

[16]Excerpts from Khalilian and Kaddoura's depositions are located at document 20 and document 29, tabs 12 & 13.

committee[17] decided that since Moosavi was already performing the job and since the prior department head had hired him under similar requirements, they must have had reason to believe that he had, in fact, completed the required course work.  (Laurie Dep. at p. 64).[18]

Roehl thought they should interview Moosavi even though he didn't meet the requirements for fear that he might mess up the class he was then teaching if he wasn't granted an interview.  (Roehl Dep. at p. 67).  In fact, Roehl was of the opinion that the committee never actually considered Moosavi for the position.  (Roehl Dep. at p. 68).  However, Dr. Wang's impression was entirely different.  Dr. Wang testified that the committee had not made a decision not to hire Moosavi before the interview.  Instead, according to Dr. Wang, the committee first did not put Moosavi or Michael Hicks, another current instructor, on the list to be interviewed, but later decided to issue them an interview as a professional courtesy and once they decided to interview them, they were given a chance.  (Wang Dep. at pp. 50-52).  Dr. Laurie's recollection of the situation was that the committee originally excluded Moosavi from consideration; then, at Dr. Wu's suggestion, they decided to interview him as a professional courtesy and to avoid "potential problems" because he was a current instructor.  (Laurie Dep. at pp. 38-41).

The committee interviewed five individuals that were current FTTIs and were under contracts that were about to expire.  (Laurie Aff. at ¶ 9).  The five individuals in the order of their years experience as a FTTI were Jamie Glass (12 years FTTI experience); Camille Steiner (11 years FTTI experience); John Long (8 years FTTI experience); Moosavi (4 years FTTI experience); and Michael Hicks (1 year FTTI experience).  (UA-0074-0076; 04183; 00206;

---

[17]Dr. Roehl, however, is still of the opinion that Moosavi had not met the 18 hours requirement at the time the decision to interview him was being made.

[18]Excerpts from Laurie's deposition are located at document 20 and document 29, tab 5.

03512; 00125-00126; 03579; 00157-00158; 00394; 00085-00086; 04082).  Initially, the search

committee chose to interview seven individuals that they considered to have the strongest

qualifications for the six positions: three of the current FTTIs (Glass, Steiner, and Long); two

individuals who had been successful graduate students in the mathematics department (Darrell

Hagler and Rachel Kennedy); one former FTTI who was from Iran (John Abby Khalilian), and an

individual from Tennessee, Suzanne Bass.  (Laurie Aff. at ¶¶ 15 & 16; Laurie 30(b)(6) Dep. at

39).[19]  As stated previously, the committee later decided to also interview Hicks and Moosavi.

On the last day of the interviews, Hagler withdrew from consideration.  (UA-05755).  The

committee, therefore, was left with eight candidates.  By secret ballot, the committee eliminated

the least two desirable candidates.  Unanimously, the committee decided to eliminate Moosavi

first and Hicks second.  (Wang Dep. at 57-58; UA-00329-00331).

### 5.  Moosavi's Interview

When Moosavi arrived for his interview, he went to retrieve an overhead projector for use

on his lesson.  (Moosavi Dep. at p. 135).  Moosavi brought marbles and cut out transparencies of

white and brown horses for use on a probability question.  (*Id*. at pp. 135-36).  He also had with

---

[19]For comparison, the committee noted that Steiner, Glass, and Long had collectively served for 31 years as FTTIs for the math department and each had performed well in their respective course captain or other leadership roles and they had years of experience teaching and leading a variety of courses as FTTIs.  The committee felt that Steiner and Long had stronger math backgrounds than Moosavi, and Glass's leadership with the math lab and her 12 years of experience as an FTTI made her a superior candidate.  (Laurie Aff. at ¶ 16).  Kennedy graduated *summa cum laude* with a bachelor's degree in pure mathematics and obtained her master's degree in pure mathematics from the University and had been named the 2000-2001 Outstanding GTA for the Math Department, Master's division.  (Laurie Aff. at ¶ 15a).  Hagler, a  graduate student in the math department, had likewise been recognized by the department for his excellent teaching skills in 2001 when he received the "Outstanding Teaching by a Doctoral Student" award.  (Laurie Aff. at ¶ 15b).  Khalilian previously served nine years as an FTTI in the math department, and during those nine years had served as a course captain for at least six courses.  (Laurie Aff. at ¶ 15d).  Although his transcript only reflected six hours in courses with math designations, it is undisputed that his master's degree in Industrial Engineering ("IE") with a concentration in Operations Research, Math, and Statistics was equivalent to optimization in math, and the IE courses he took constituted high level math.  (Allen Dep. at pp. 54-55; Khalilian Dep. at pp. 26-31; Pltf. Ex. 3 to Khalilian Dep.; Laurie Aff. at ¶ 15d).  Bass had a bachelor's degree in education/mathematics; a master's degree in education, with an emphasis in mathematics; and she was completing her dissertation for her doctorate in mathematics with an emphasis in mathematics.  Her resume also indicated she had completed the course requirements for a master's degree in theoretical mathematics.  She had over ten years teaching experience, including experience teaching at the college level.  (Laurie Aff. at ¶ 15c).

him the problems written down on transparencies for explanation in his lesson.  (*Id*. at pp.

245-46).  As he retrieved the projector, Dr. Fisher told him that he could not use it.  (*Id*. at p.

135).  Knowing that Dr. Fisher was not a committee member, Moosavi ignored her and

continued on with his preparation.  (*Id*. at pp. 235-36).  Then, when Dr. Wu entered the room and

saw Moosavi with the projector, he told him he would not be able to use the projector because

none of the other candidates had used a projector[20] and because "the traditional way of teaching

is using a chalkboard and whiteboard or markers."  According to Dr. Wu, "That is a major way

of conducting teaching in the classroom.  So in [his] point of view, [he would] like to see the

candidates . . .  Conducting their interview process in that way so . . . [he] can see what they did

on the board.  [He] can get more information compared to just put[ting] a transparent [sic] on the

overhead projector."  (Wu Dep. at pp. 227, 235).  Other members of the committee also expected

the interviewees to use the whiteboard so that they could evaluate their board work.  As Dr.

Laurie explained in her affidavit, "what is written on the board, as a person discusses a problem,

is important for several reasons.  Clarity of board work is important for students taking

understandable notes.  How the board work connects with what is being said reveals a lot about

how the person perceives and communicates connections between ideas."  (Laurie Aff. at ¶ 19).

As a part of his claim in this court, Moosavi complains that he was unfairly treated in the

teaching portion of his interview on April 25, 2002, because he was unable to use prepared

overhead transparencies to answer the problem set.  (Moosavi Dep. at pp. 149-50, 235-39;

UA-00310).  All of the other candidates used the whiteboard or chalkboard to work the assigned

problems; Moosavi was the only candidate that wanted to use an overhead and transparencies

---

[20]Several days later, Moosavi learned that another applicant used golf balls on his probability question.

during his interview.  (Queen Dep. at p. 159).

Moosavi did not complain or suggest to the committee that his ability to present the material would be limited if he had to use the whiteboard instead of his transparencies.  Moosavi was not precluded from using his notes, and did so during the interview.  (Laurie Aff. at ¶ 20).  In fact, on her interview evaluation form, Dr. Laurie gave Moosavi the highest score available on his use of the chalkboard.  (UA-00314).

Dr. Laurie concluded that Moosavi's interview was the weakest.  She felt that it lacked organization and clarity in presentation and that he (Moosavi) lacked confidence in the classroom.  Dr. Laurie also felt that, despite relatively basic questions, Moosavi relied too much on his notes and still made conceptual errors, confirming the committee members' concerns about the strength of his math background.  (UA-00314; Laurie Aff. at ¶¶ 13, 20).

Moosavi testified that he handled the questions from Fisher and Queen well.  (Moosavi Dep. at pp. 247-48).  By watching the interviewees answer questions from "students," the search committee members could evaluate whether the interviewee understood the question or asked for clarification until he/she understood the question; whether the teacher went to "the heart of the matter" in answering the question; whether the board work in answering the question fit in with the board work already presented; and whether the interviewee appropriately handled a question that he could not answer.  (Laurie Aff. at ¶ 19).  Queen and Dr. Fisher asked similar questions of all the interviewees.  (Laurie Aff. at ¶ 18).  Queen testified in deposition that she and Dr. Fisher asked the same types of questions to all the interviewees about the same problems, like "Aren't I supposed to do this" or "Aren't I supposed to do that" or "Where did you get that" to see what kind of explanation the instructor would give.  (Queen Dep. at pp. 100-01).  Dr. Fisher testified

that although they had to react to what the person did, she pretty much asked the same questions of Moosavi as she asked of the other interviewees.  (Fisher Dep. at pp. 94-95).  Khalilian testified that Dr. Fisher was aggressive in her questions to him about probability, by asking "How about this," "How about that."  (Khalilian Dep. at pp. 64-65).  Dr. Kaddoura testified that Dr. Fisher and Ms. Queen asked a normal amount of questions, and that she did not feel that there were too many of them.  (Kaddoura Dep. at p. 45).  After that segment, Queen and Fisher were dismissed and the committee asked the applicants questions about the role of a course captain, the use of computerized instruction and the role of the instructor in that setting, and other attitudes about teaching.  (Laurie Aff. at ¶ 18).

### 6.  The Committee's Concerns Regarding Moosavi

#### a.  Moosavi's Math Background

The committee's comparison of the depth and number of math hours on Moosavi's transcript with the math backgrounds of the nine applicants the search committee interviewed and wanted to hire instead of Moosavi revealed to them that Moosavi had one of the weakest math backgrounds.  Four of the persons recommended over Moosavi for the FTTI position had the preferred master's degrees in mathematics (Steiner, Kennedy (Bishop), Ponta, and Kaddoura) and another four had transcripts that reflected more rigorous math courses than Moosavi's weaker "topics" mathematics courses (Hagler, Long, Khalilian and Bass).  (Laurie Aff. at ¶¶ 15a-f and ¶ 16; Wu Dep. at pp. 365-68).  The committee observed that Glass's math background was the most similar to Moosavi's, but she had more relevant experience as an FTTI course captain (having held that position in the math department for 12 years); she played a leadership role in running the math lab as the lab manager; and she was instrumental in

15

instigating initial pilot sections for computerized math instruction at the introductory math level. (Laurie Aff. at ¶ 16).

Dr. Laurie also noted that Moosavi's repeated mistakes on Math 121 tests and exams concerned the committee because, as course captain for Math 121, he was responsible for preparing the departmental exams for the rest of the faculty, instructors, and GTAs. Dr. Laurie was concerned about Moosavi's math competence because of the repetitive mathematically misleading and conceptual mistakes that she had seen personally and that she had heard Moosavi was making on the Math 121 exams. (Laurie Dep. at pp. 38, 59, 63; Laurie Aff. at ¶ 12). Laurie had also heard from Dr. Roehl and Queen that Moosavi not only made repetitive mistakes, but that he reacted defensively when the mistakes were pointed out and did not want to make changes or would agree to make changes and then not do so. (Laurie Aff. at ¶¶ 11-12; Laurie Dep. at p. 61).

Dr. Roehl taught Math 121 in Spring 2001, when Moosavi was course captain, and he "had his qualms" about Moosavi as a course leader. On one occasion, Dr. Roehl raised a concern he had about one of the problems on a test not being an appropriate problem for the test, and was dissatisfied with Moosavi's simple response that the problem was in the book. (Roehl Dep. at pp. 23-24). Dr. Roehl felt that too much of the credit for this particular problem was awarded for the student's algebraic knowledge instead of for the analytical knowledge that should be tested in a business calculus course. Dr. Roehl perceived Moosavi's attitude to be that it was appropriate simply because the problem and/or the concept of algebraic simplification in an analytical context was in the book. He was not impressed with Moosavi's attitude that a test problem and/or a concept is a good one just because it appears in the book. (Roehl Dep. at pp. 21-23,

16

25-26; Roehl Aff. at ¶ 7).[21]

Nancy Freeman, a FTTI who taught in the math department for ten years, was asked to proofread Moosavi's exams in the Spring of 2001.  (Freeman Aff. at ¶ 9;[22] Queen Aff. at ¶ 25). Freeman's affidavit testimony relates an incident in which Moosavi re-used a "confusing" math problem even after he was aware that this problem had generated complaints and demonstrated that Moosavi did not understand a fundamental math concept.  According to Freeman, Moosavi first used this particular problem on the fourth test in the Spring of 2001.  After there were complaints about the problem, Freeman wrote out two test problems that were more straightforward for Moosavi that he could use to test the same concept.  When the final exam came out a few weeks later, the confusing math problem appeared.  Freeman complained to Queen about Moosavi's failure to make the change.  (Freeman Aff. at ¶ 10; Queen Aff. at ¶ 26).

Finally, Dr. Laurie testified that Moosavi's interview did not alleviate her original concerns regarding his math background.  According to Laurie, the questions on the problem set the applicants were required to work during the "teaching" portion of the interview were typical of individual courses and not difficult questions, and should not have required extensive preparation or reliance on notes.  (Laurie Aff. at ¶ 20; Fisher Dep. pp. at 98-99).  One of the applicants, Khalilian, described the level of difficulty of the problems they were given to teach for the interview to be very basic questions, with two of them being very simple.  (Khalilian Dep. at pp. 68-69).[23]  Even Moosavi described the problems as being "eighth grade math" and there

---

[21]Roehl's affidavit is located at document 19.

[22]Freeman's affidavit is located at document 19.

[23]Excerpts from Khalilian's deposition are located at document 20 and at document 29, tab 13.

was nothing they could ask him that he did not know.  (Moosavi Dep. at pp. 247-48).  Moosavi's

girlfriend testified, however, that Moosavi was nervous about getting everything prepared for the

interview because this was the first time he had to answer problems in an interview and he

"worked for several days" getting his answers prepared.  (Motte Dep. at pp. 114-16).[24]  In

contrast, Kaddoura's preparation time for reviewing the problem set for her interview was

limited to the night before her interview.  (Kaddoura Dep. at p. 35).[25]  Dr. Laurie testified that

Moosavi made conceptual errors in the discussion of two of the problems and he did not fully

acknowledge his errors upon questioning.  In notes made during Moosavi's interview, Dr. Laurie

documented that Moosavi seemed to need to rely on his notes to work the problems.  These

observations confirmed her concerns about his understanding of math concepts and the weakness

of his math background, and she found his interview performance to be the weakest of all those

who interviewed.  (Laurie Aff. at ¶ 20; UA-00314-324).  Dr. Roehl likewise found Moosavi's

interview to be the weakest of all, substantiating his opinion that Moosavi did not have an

adequate math background.  (Roehl Aff. at ¶ 6).

### b.  Moosavi as Course Captain

The search committee was also concerned about Moosavi's problematic performance as a

course captain.[26]  Dr. Laurie testified that the committee had knowledge that Moosavi had a

problem with procrastination.  He would be late getting the exams to proofreaders and sometimes

---

[24]Excerpts from Motte's deposition are located at document 20.

[25]Excerpts from Kaddoura's deposition are located at document 20 and document 29, tab 12.

[26]The math department secretary, however, testified that Moosavi was one of the best instructors in the department and that he worked very hard, went to all his classes, worked well with his students and with those who worked for him, and he strived for perfection.  *See* Declaration of Marion Olivia Stanley located at document 31.

18

the instructors would not get a chance to look at the exams before they were given to students. Dr. Fisher showed Dr. Laurie some of the problems on Moosavi's exams once or twice, and Dr. Laurie had heard complaints about mistakes on the exams from Dr. Roehl and Dr. Dick Brown. (Laurie Dep. at pp. 35-37).  In addition to mathematically misleading mistakes on the exam, Dr. Laurie was concerned that when someone pointed out a mistake on the exam, Moosavi would agree, but then make no changes; and this behavior was repeated.  Dr. Laurie was also concerned about the repetitive nature of Moosavi's mistakes.  (Laurie Dep. at pp. 38-40; Laurie Aff. at ¶ 12).

Likewise, Dr. Wu testified in his deposition that Moosavi had problems meeting deadlines, such as submitting drafts of tests and grades and statistics sheets on time, and in the quality of the design of his tests.  (Wu Dep. at pp. 283, 285-87).  The FTTIs were supposed to meet those deadlines, and the other instructors did, to his knowledge, meet those deadlines except for Moosavi.  (Wu Dep. at pp. 286-87).  In the Spring of 2001, Dr. Wu noted on Moosavi's evaluation that he needed to "pay more attention to deadlines and quality of work." (UA-00898).  He mentioned this to Moosavi when they met about the evaluation. (UA-00898-899; Wu Dep. at p. 302).  Because Dr. Wu did not know what the reason was for him not meeting the deadlines and why he was having problems with the quality of his work, he gave him the benefit of doubt on his 2001 evaluation scores.  (Wu Dep. at pp. 302, 305).  That evaluation score, however, was the lowest among the FTTIs who applied in 2002.[27]

In the following Fall 2001 semester, Dr. Wu taught Math 121 under Moosavi while he

---

[27]The search committee never saw Dr. Wu's faculty activity report or evaluations of Moosavi or the other FTTIs who were seeking to be re-hired.  (Laurie Dep. at p. 67; Laurie 30(b)(6) Dep. at pp. 0-31).  However, compared with the other applicants in the 2002 pool, Moosavi's 2001 evaluation score was the lowest among these FTTIs.  (UA-00955-957; 01022-1026; 00985-987).

was course captain.  During that semester, Dr. Wu witnessed Moosavi's mistakes, carelessness, and confusing work.  Dr. Wu also experienced problems with Moosavi with test preparation and he had to volunteer himself to look through a test draft and try to improve the quality of Moosavi's test.  Dr. Wu concluded after the Fall 2001 semester that Moosavi had not dedicated himself to his job as course leader.  (Wu Dep. at pp. 302, 366, 367, 370).

The next semester, Dr. Wu became aware of an additional complaint by Dr. Brown about errors on the second test (UA-00030-32), but he left it to Queen to deal with that complaint.  (Wu Dep. at p. 91).  Dr. Laurie heard about Dr. Brown's complaint about mistakes on Moosavi's Math 121 test as well.  (Laurie Dep. at pp. 35-36).  At the end of that year, Moosavi's overall evaluation score from Dr. Wu ranked again as the very lowest among the FTTIs who applied for the job in the 2002 search.

For Dr. Wang, being a good course captain was also an important consideration, as well as having a strong background in mathematics.  (Wang Dep. at p. 48).  In Dr. Wang's opinion, an applicant need not have actually been a course captain to be a good course captain.  (*Id*. at p. 35).  In addition to regularly teaching undergraduate and introductory math lecture courses, Dr. Wang also regularly taught introductory math courses like 005, 100, 110, 112, and 121 for the "Distance Education" correspondence courses.  (*Id*. at pp. 13-14, 16, 19).  Dr. Wang testified that he was teaching Math 121 with the "Distance Education" program and asked for some assistance from Moosavi, but did not get a timely response from him.  (*Id*. at pp. 60-63).  Dr. Wang wanted to be sure his "Distance Education" course was consistent with the math department's Math 121 course.  He asked Moosavi to provide to him the Math 121 syllabus he was using at that time. Moosavi did not give him what he requested in a timely fashion, and Dr. Wang had to wait at

least a month before Moosavi gave him anything, causing the "Distance Education" department to close that particular Math 121 course until the syllabus was revised. Although Dr. Wang did not give Moosavi a time limit to get him the syllabus, he did expect he would have received it as soon as possible, because the new course was on hold. (Wang Dep. at pp. 60-68).

In one of the first search committee meetings before the committee selected the list of applicants for interviews, they decided that Queen should provide background information on the job performance of the people who had taught for the University, if she knew any information. (Laurie Dep. at p. 29; Queen Dep. at p. 114; Wu Dep. at pp. 313, 342). The committee did not look at faculty activity reports, which are confidential, or personnel files. (Laurie 30(b)(6) Dep. at pp. 30-31; Laurie Dep. at p. 67). Instead, the committee decided that Queen was the best person at that time to brief the committee on the applicants, because she did the day in and day out management of the introductory level math program and knew more information. (Wu Dep. at p. 315). During one meeting and in response to the committee's request, Queen provided information on the strengths and weaknesses of every individual who had taught at the University of whom she had knowledge. Because Queen was not aware that the committee was going to ask her to do this, Queen did not provide this information to them in writing. After she gave her brief comments, she was not involved in the search committee's meeting or discussions. (Queen Dep. at pp. 114-15). Nor was she involved in the decision process on who to invite for interviews after two candidates (Kennedy and Bass) turned the job offers down. (Queen Dep. at p. 125). Dr. Wang testified that while Queen presented information about the applicants to the search committee, the committee made up their own minds, not based on what Queen gave them, because Queen's presentation was just part of the information the committee considered. (Wang

21

Dep. at p. 59).  Dr. Wu likewise agreed that Queen's role was limited to providing this

information about the candidates and that she had nothing to do with the selection of the

individuals.  (Wu Dep. at p. 164).  Ms. Queen was not part of the selection committee, did not

vote for or evaluate the candidates, and was not invited to participate in and did not participate in

the deliberations that occurred among the search committee members in choosing which

applicants to interview and which ones to recommend for hire.  (Laurie Aff. at ¶ 18; Wu Aff. at ¶

9; Wang Aff. at ¶ 6;[28] Roehl Aff. at ¶ 5).

Queen informed the search committee that Moosavi's strength was his teaching, that

students got along well with him, and that he had an easy-going personality.  She also noted that

his weaknesses were that he tended to procrastinate, that he frequently got things in late

(tests/exams to proofreaders or for copying), and that there were repeated mistakes made in the

preparation of the exams.  (Queen Dep. at p. 115; Laurie Aff. at ¶ 11).

Queen's comments regarding Moosavi stemmed from the following:

Ms. Queen testified that Moosavi's problems in performing in his course
captain role included procrastination and running late, and errors and mistakes on
tests. . . .  Moosavi frequently ran behind on his time in preparing exams and other
things like statistics or syllabi.  (Queen 30(b)(6) Depo. at 18) [sic][29]  Ms. Queen
similarly testified in her individual deposition that his weaknesses were that he
tended to procrastinate and frequently turned things in late.  (Queen Depo. at 115)
He would neglect to turn things in, mainly test statistics.  She had a hard time
getting information from him.  His work ethic was a bit slow and she felt like he
tended to be a little bit lazy at times.  (Queen Depo. at 124)  When Ms. Queen
suggested in the meeting she called in the Spring of 2002 (after receiving Dr.
Brown's complaint of too many errors on the test) that faculty members proof his
work, Moosavi admitted his problems by stating: "I would welcome any help I
can get.  It is no privilege to have to write all of the tests!"  (Queen Depo. at

[28]Wang's affidavit is located at document 19.

[29]The correct cite for this testimony is Queen Dep. at p. 124.

117-119; UA-00030-32; Queen Affidavit ¶ 37)

      Prior to Spring 2002, Ms. Queen had spoken with Moosavi in her office several times and told him he did not need to make the kinds of mistakes he had been making, like having test questions that did not have the correct answer, or multiple choice test questions with two correct answers, or where the wording in the problems would be incorrect; and the concept behind the word problem might be incorrect somehow.  (Queen Depo. at 119-120; Queen Affidavit at ¶ 35 & ¶ 36)  Because of the errors on the test, instructors under Moosavi acting as a course captain sometimes had to award points to the students or eliminate problems that were not acceptable.  (Queen Depo. at 120-121)  When Ms. Queen pointed out these mistakes to Moosavi, he did not seem troubled when some of the same mistakes were repeated on subsequent tests, and he usually received her constructive criticism in a casual manner.  Once, when she pointed out that he had used small "x"s and capital "X"s without distinction in a problem, as if they were interchangeable and/or the same, Moosavi responded with a casual "Well, the student will know what we mean.  It's not that big a deal."  (Queen Affidavit at ¶ 36)  . . . .

      . . . .  [I]n a memo [Moosavi] wrote to Dr. Wu dated June 11, 2002[,] [he stated]:

> I am still not quiet [sic] sure why I have been dismissed.  *I admit that I have made mistakes*, at the same time as I have proposed before *there is simple solution to some difficulties that I have had with typing and preparing tests.*
>
> As a person who has taken and then taught test and measurement classes I am well aware of complexity of good test making.  I am also aware that there are professional test makers whose test banks are readily available upon request from publishing companies.

(UA-02450). . . .

(Doc. 18 at 48-50) (italics in text).  Queen further testified that:

>       . . . .  He had difficulty getting his tests written, proofed and submitted for duplication in a timely manner and he frequently ran behind and rushed through the "proof/copy" schedule process at the last minute, if at all.  While a couple of other FTTIs might have gotten a test submitted after the deadline, this was not a usual practice for them as it was for him. . . .
>
>       Although the other FTTIs would . . .  make mistakes on the tests that they wrote, their mistakes would usually include simple typos, mis-numbering a test

(e.g., having two problems labeled # 8), or occasionally having an incorrect sign or multiple-choice answer on the answer key.  When mistakes occurred, the other FTTIs would be meticulous to ensure that it was not repeated on future tests. Thus, their mistakes were not routine and did not happen frequently.  (Queen Affidavit at ¶ 34)  Moosavi, on the other hand, had frequent and repetitive mistakes on the tests that he wrote.  Several times, Moosavi's Math 121 *tests had conceptual mistakes*, like giving a function and asking students to find the relative minimum or relative maximum when there was not one, or basing an economics type problem on a given "demand" function, but using a function that by definition does not behave like a "demand" function.  (Queen Affidavit at ¶ 35) His *tests also had misleading and confusing statements*, like when he would provide hints on how to work difficult problems, but the hints would be incorrect; or when he would provide directions to use a particular formula to solve the problem, but the given formula would be the wrong formula.  (Queen Affidavit at ¶ 35)  The wording of his problems frequently had mistakes, like when his problem would start out with a "ball" being thrown into the air, but would end up asking a question about when the "stone" hits the ground; or when his business problem would start out with a product of "calculators," but end up asking a question about "VCRs."  (Queen Affidavit at ¶ 35)  Sometimes *his problems were just wrong*, like asking a multiple choice question and providing no correct answer among the choices, or providing more than one correct answer.  (Queen Affidavit at ¶ 35)

       Moosavi also continued to have *problems with correct notation*.  He would sometimes use notation and wording from older textbooks instead of using notation and wording from the current textbook.  The terminology might vary slightly, which is not problematic to a mathematician but could be very problematic to a student in introductory mathematics.  Moreover, it was important that the tests looked professional, were student friendly, and were clear and easy to read for the students.  [*Id.*].

(Doc. 18 at pp. 50-52) (italics in text).

       Queen first told Dr. Wu about the lower quality of the tests that Moosavi had written after Fall 2000, her first semester on the job.  Queen told Dr. Wu that he had multiple errors on the tests and seemed to have problems submitting the tests to proofreaders and to the secretary for duplication in a timely manner.  (Queen Aff. at ¶ 33).  It also seemed to Queen that Moosavi had difficulty typing the tests with correct mathematical notations.  (Queen Aff. at ¶ 25).

Consequently, Queen asked Nancy Freeman to help Moosavi become more proficient at using one of the software products used by the other FTTIs to write math tests. (Queen Aff. at ¶ 25).

Freeman testified that consistent with his reputation as a GTA in procrastinating with his assignments, Moosavi would hastily prepare his tests, cutting and pasting from his old tests as much as possible. He never got his test preparation done ahead of time, and frequently, she would not see the last version of a test that Moosavi had prepared until after it had been distributed to the students. He was also rarely around to assist students during his office hours, which was a habitual problem in the decade Freeman worked with him. (Freeman Aff. at ¶¶ 7, 10).

At the end of the Spring 2001 term, Dr. Wu asked Queen to provide feedback to him on all the FTTIs for the entire year. Regarding Moosavi, Queen responded as follows: "Seyed has a good rapport with the students; will help out if asked to do so; very laid back - probably too much so; procrastinates - waits until last minute to get things done; does not communicate well with instructors for the course he is leading; there is some question about the quality of his work." (Queen Aff. at ¶ 32; UA-05315). A few days later, on May 14, 2001, Dr. Wu noted on Moosavi's annual evaluation that he needed to "pay more attention to deadlines and quality of work." (UA-00898-899; Wu Dep. at p. 302).

During the Fall 2001 semester, Moosavi had both the department chair and another tenured faculty member (Dr. Wang) teaching under him. These two tenured faculty members caused the head of the department to have to become involved with the problems with Moosavi and talk with Moosavi about his need to improve. (Wu Dep. at pp. 302, 366, 367, 370; Wu Aff. at ¶ 17). This semester, Queen also received a complaint about a poorly prepared draft of a test

and about a problem from prior tests that had reappeared on one of his tests.  (Queen Aff. at ¶ 26 & ¶ 30).  At the end of the semester, Queen cautioned Moosavi that more important people than she were noticing the problems with his work, and she "encouraged him to step up to the plate and be very impressive for the Spring 2002 term."  (Queen Aff. at ¶ 29).  Moosavi acknowledges having this conversation with Queen.  (Moosavi Dep. at p. 274).

The following semester, by the second test, Queen received more complaints.  This time, she received an e-mail from Dr. Dick Brown, a tenured full professor teaching Math 121, complaining that Moosavi's exams contained a number of poorly worded problems that could interfere with student understanding of the questions, and suggesting that another person be in charge of the Math 121 exams.  (UA-00030-32; Queen Aff. at ¶ 30).  At the end of the Spring 2002 semester, Dr. Wu again asked Queen to provide comments to him regarding the performance of all of the FTTIs for the 2001-2002 academic year.  Once again, her comments reflected the problems she had experienced with Moosavi's course captain responsibilities that year:  "Continued problems with submitting work in a timely manner.  Continued problems with the quality of the work he submits.  He is disorganized - has not turned in test statistics to me.  Students have not complained about his teaching, but I frequently see people looking for him unsuccessfully.  He does not seem to be around the office much."  (Queen Aff. at ¶ 32; UA-05319).

In mid-May 2002, Dr. Wu called Moosavi to his office and told him his name was not on the first list sent to the Dean recommending employees for the FTTI positions.  (Moosavi Dec. at ¶ 27).  According to Moosavi, Dr. Wu told him that the applicants selected had more experience and higher degrees than he had.  (*Id.*).

26

### 7.  The Applicants Offered the FTTI Positions

John Long held a B.S. in Engineering and a M.A. in Education.  At the time of the interview, Long had been a temporary instructor at the University since 1994, was an adjunct instructor at another college for 5 years, was a GTA for nine years in the University math department, and was an engineering instructor for nine months.  (Doc. 29 at Ex. 18).

Jamie Glass held a B.S. in Math and a M.A. in Education.  At the time of the interviews, Glass had been an instructor at the University for 11 years, taught three semesters at another college, and taught at the high school level.[30]  Glass was also the pilot coordinator for Math 100 and oversaw the computer technology course for two sections of Math 100.  (Doc. 29 at Ex. 19).

John Abby Khalilian held a M.S. in Engineering.  At the time of the interviews, Khalilian had taught Algebra and Geometry at the high school level and had been an instructor and course captain at the University for college algebra, precalculus, trigonometry, business math, business calculus, exhilarating precalculus with trigonometry, and had experience writing departmental exams.  Additionally, Khalilian had been a GTA at the University and had been a professor's assistant in the Industrial Engineering Department for four years.  Khalilian also had experience teaching algebra and trigonometry at another college.  (Doc. 29 at Ex. 20).

Camille Steiner held a B.S. in Mathematics and a M.S. in Mathematics.  At the time of the interviews, she had been a FTTI at the University for 11 years and had been a GTA at another University for two years.  (Doc. 29 at Ex. 21).

Rachel Kennedy held a B.S. in Pure Mathematics and a M.A. in Pure Mathematics.  At

---

[30]Glass taught Advanced Placement Calculus, Algebra I, II, and III, Geometry, Trigonometry, and General Math at the high school level.  At the college level, Glass taught Elementary Algebra, Precalculus Algebra, Business Precalculus, Introductory Mathematics, Intermediate Algebra, Precalculus Trigonometry, Introductory Algebra, Introductory to Math Reasoning I & II, and Calculus I.

the time of the interviews, she had been a GTA at the University for a year and a half, teaching

Pre-calculus Algebra, Remedial Algebra, and Business Calculus, as well as a math teacher at the

high school level teaching Algebra I, Advanced Math/Trigonometry, Geometry, and Calculus.

(Doc. 29 at Ex. 22).

Suzanne Bass held a B.S. Ed. in Mathematics and a M.S. Ed. in Mathematics.  At the

time of the interviews, she had been an adjunct math professor and GTA for about six years.  She

also had four years experience at the high school level teaching physics, applied mathematics I &

II, pre-algebra, algebra I & II, geometry, pre-calculus, and arithmetic 9, among other courses.

(Doc. 29 at Ex. 23).

Kennedy declined her offer and the committee decided to interview Aurora Ponta.[31]

Ponta had a M.S. in Mechanical Engineering and a M.A. in Applied Mathematics.  (Doc. 29 at

Ex. 24).  Ponta applied for the FTTI position in April, but the committee initially denied her an

interview.  (Laurie Dep. at p. 31; Roehl Dep. at p. 57).  Because Ponta was in Romania for the

summer, her interview did not take place until August 9, 2002.  (Laurie Aff. at ¶ 15e).

Bass also declined her offer on August 2, 2002.  (UA-00519).  Mawai Kaddoura applied

by email on August 3, 2002.[32]  Kaddoura held a B.S. in Physics and Mathematics, a M.S. in

Applied Mathematics, a M.S. in Applied Statistics, and a Ph.D. in Applied Statistics.  (Doc. 29 at

Ex. 42).  Kaddoura is a Libyan Muslim.  (Kaddoura Dep. at p. 42).  Kaddoura had previously

been employed by the University but had not been re-hired based on a bad evaluation in 1992.

---

[31]At the time of the interviews, Aurora Ichim Ponta had been a temporary instructor at the University for a little over two years and had been a GTA for two years.  (Doc. 29 at Ex. 24).

[32]Dr. Kaddoura learned of the opening in mid-July when Moosavi called to encourage her to apply.  (Kaddoura Dep. at pp. 21-22, 34-35).

(Kaddoura Dep. at pp. 12-14).  Kaddoura had not applied for the 2002 position initially, but sent her application to the University in August at Moosavi's recommendation.  (Kaddoura Dep. at pp. 22-23, 34).

Kaddoura's interview format was the same as the April interviews.  (Kaddoura Dep. at pp. 30-32).  She was also given an interview on August 9, 2002.  Dr. Wu was in China on the date of the interviews so Dr. Laurie headed the committee.  On the same day as the interviews, the committee recommended both Ponta and Kaddoura for hire.  (Laurie Aff. at ¶¶ 15e-f).  Dr. Wu then emailed the committee's recommendation to the Dean that same day.  (UA-02348-49).

### 8.  Plaintiff's Complaints of Discrimination

During 1994-1998 when Moosavi was a GTA, he felt like Nancy Fisher discriminated against him.  (Moosavi Dep. at p. 101).  On one occasion, Fisher called both Moosavi and Dr. Allen "male chauvinist[s]" when they disagreed with her as to how a math problem should be graded.  (Moosavi Dep. at pp. 103-07).  Also on that occasion, Fisher told Moosavi that she knew he came from a culture where women are treated without respect but this was not his country or culture where females are sub-human.  (Moosavi Dec. at ¶ 15; Allen Dep. at p. 35).  On another occasion, Fisher required a Jewish student to bring a letter from a rabbi proving he was Jewish before he would be allowed to re-schedule an exam for a Jewish holiday.  (Allen Dep. at p. 38).  Fisher once asked Moosavi which sect of Islam he belonged.  (Moosavi Dep. at pp. 119-20).  On another occasion, Moosavi was talking about the presidential election and Fisher stated "Good Agenda!  You are not even an American!"  (Doc. 29, Tab 31, p. 2).

Stanley, the math department secretary testified that she witnessed Fisher treat Moosavi and Khalilian in a derogatory manner.  She further stated that Fisher singled out Moosavi and

Khalilian and said things to undermine them and treated them more harshly than the other instructors.  (Ex. 31 at ¶ 6).

In December 2000, the math department was invited to a luncheon by the associate dean. The luncheon fell on the same day as Ramadan, a Muslim holiday during which a Muslim fasts from sunrise to sunset.  Moosavi told Dr. Wu he could not go because of the holiday and Dr. Wu suggested that he go and not eat.  Moosavi told Queen that he would rather not go because it would be uncomfortable since he could not eat or drink and Queen suggested that he go and tell people he is dieting and not to tell them he was a Muslim and fasting.  (Moosavi Dep. at pp. 278-87).

After the terrorist attacks of September 11, 2001, Moosavi felt like the ethnic and religious comments directed at him worsened.  (Moosavi Dec. at ¶ 18).  Stanley perceived that Moosavi was given classes and tasks that made him have to change his schedule so that he would be unable to take classes for his Ph.D. studies.  (Doc. 31 at ¶ 14).  Stanley heard Fisher and Queen joking that he would never finish his Ph.D.  (Doc. 31 at ¶ 15).  Stanley also heard Fisher say that Moosavi needed to get his Ph.D. and "get out of here."  (*Id*.).

After 9/11, one of Moosavi's colleagues asked him why they hated Americans so much and on another occasion, stated in Moosavi's presence that he would like to go out and kill someone from "one of those countries" just to make himself feel better.  (Moosavi Dep. at pp. 202, 220).  Another colleague in the math department would not look at Moosavi after 9/11. (Moosavi Dep. at pp. 202, 217-19).

During a departmental meeting in Fall 2001, regarding applications for the undergraduate head of the math department, Fisher remarked in Moosavi's presence, "that's just another middle

age foreigner that is applying for that job."  (Moosavi Dep. at pp. 121-22; Doc. 29, Tab 31, p. 2).

Moosavi also alleges that Queen made statements to Moosavi and in his presence about "those people" and "all Muslims."  (Moosavi Dep. at pp. 203-05).  Queen asked Moosavi about the root of the hatred towards Americans and while he tried to explain that not all Muslims are the same and that he did not want to be responsible for a nation or sect of religion she asked, "why do you all hate Americans so much?"  (Moosavi Dep. at pp. 207-09).

During a faculty meeting, Queen made a reference to "these foreigners," and Moosavi corrected her by stating, "international students you mean," to which she replied, "Whatever, these foreign students who don't speak English are our biggest problems."  (Doc. 29, Tab 31, p. 2).

On another occasion, Queen and Moosavi were in the computer lab one day when she began discussing a Muslim doctor who was talking on the television about not being allowed to fly and being asked to leave an airplane and that she was sick and tired of hearing "those people" complain on television that they are searched and delayed at the airport and prevented from flying.  (Moosavi Dec. at ¶ 20).  She then said she had no problem if they kept "those people" all in a camp until they found a way to deal with it if it made society safer.  (*Id*.).  Moosavi replied that she kept saying "those people" and that he was one of "those people" and his brother is one of "those people" and that  her comments bothered him.  (*Id*.).  He explained to her that anyone can be Muslim and you can't detain everyone just by looking at them and that there are Europeans that are Muslim.  (*Id*.).  She replied that it was those Muslims from the Middle East that were doing these things.  (*Id*.).  Stanley testified via declaration that after the September 11th attacks she heard Queen talking to a group of employees and state that all of "those people"

should be put in camps and that Queen would refer to terrorists and Middle Easterners as "those people" in Moosavi's presence.  (Doc. 31 at ¶ 15).

On a subsequent occasion, Moosavi was making copies in the mathematics office when Queen began talking to a group of people in the office and said everybody says these foreigners that we know here in the department are usually very gentle and kind but she didn't believe it. (Moosavi Dec. at ¶ 21).  She then said, what else could they do but pretend to be nice and that if they had the means and ability to hurt us they would do it just like the 9/11 terrorists.  (Moosavi Dec. at ¶ 20; Doc. 29, Tab 31, p. 3).  Moosavi became so upset that he left, went upstairs to the bathroom, and became physically ill.  (Moosavi Dec. at ¶ 20).

Queen also made comments in Moosavi's presence about "those people who have nothing better to do than high-jack an airplane because they don't have anything else to do, they can high-jack an airplane and blow up buildings."  (Moosavi Dep. at p. 212).  On another occasion in Fall 2001, while Moosavi and Queen were in the middle of a discussion in her office regarding a grading issue, a GTA from South Korea entered the office and Queen stopped her conversation, turned to the student and asked if he was a Christian.  (Moosavi Dec. at  ¶ 22; Doc. 29, Tab 31, p. 3).  He replied that he was and Queen proceeded to discuss Yunbea's conversion to Christianity while Moosavi waited to resume their initial discussion about a student grade. (Moosavi Dep. at pp. 14-21).  Queen then asked the student if he knew any "good Christians" that would want to come and join her Bible study class after school next term.  (Moosavi Dec. at ¶ 22; Doc. 29, Tab 31, p. 3).  Queen then told the student she knew he had not passed his English proficiency class but she would write a letter of recommendation for him.  (Moosavi Dec. at ¶ 22; Doc. 29, Tab 31, p. 3).  Moosavi left the office with the student and did not finish his discussion

with Queen.  (Moosavi Dec. at ¶ 22).

Moosavi further alleges that Queen would make comments all the time like "every Middle Eastern looking man is a possible threat" and she "did not see what is the fuss about when they search them at the airport" and that as far as she was concerned, "you should just keep them all and search them all."  (Moosavi Dep. at p. 231).

A student from Saudi Arabia asked Moosavi if he could take his final test a few days early because the student planned to leave for Saudi Arabia to spend the Muslim holiday of Ramadan with his family.  Moosavi approved the request and allowed the student to take the test early.  Queen confronted Moosavi, very upset, and told him that he could not change tests because someone says it is a holiday and asked him if he had checked to see if it was a valid reason.  (Moosavi Dec. at ¶ 23).  Moosavi contends that Queen had never had a problem with him allowing other non-Muslim students to take a test early or late for any reason.  (Moosavi Dec. at ¶ 23).

Moosavi maintains that Queen would ignore him, refuse to look at him, and would not even maintain a civil or casual conversation with him or say "hello" or "how are you."  (Moosavi Dep. at pp. 213-14, 217-18).  Moosavi also alleges that he would hear Fisher talking outside his office to other colleagues in the math department and use the terms "Muslim" or "Iran" and then she would cease talking or leave when he approached them.  (Moosavi Dep. at pp.129-33, 221).

After 9/11, Moosavi felt like it was hard to get the members of his Math 121 team to help him and work as a team as they had before.  (Moosavi Dec. ¶ 25).  When he asked Fisher for help, she would not help or support him as the course captain and when Moosavi complained to Queen, she would do nothing about it.  (*Id*.).

Moosavi alleges that he complained to Dr. Wu, the head of the undergraduate math department, at least twice about the way he felt like he was being treated.  (Moosavi Dec. at ¶ 26; Moosavi Dep. at p. 285).  However, in his deposition testimony, Moosavi stated:

Q.   Anything else?  Did Dr. Wu ever say anything hurtful to you?

A.   No.  I don't believe he ever did.  I don't think we ever – I think I complained to him one time–

Q.   What did you complain about?

A.   I think I just complained about the atmosphere being so hurtful and so anti-my kind I guess.  I tried to get some feedback from him, but he always is too polite to say anything, so he said – I probably talked about half an hour but –

Q.   You talked to Dr. Wu for half an hour?

A.   I probably did.  I don't know, it was a long time.

Q.   In his office, your office?

A.   His office.

Q.   When?

A.   It was sometimes after 9-11.

Q.   Shortly after 9-11?

A.   Probably a month after 9-11.  I really don't know how much of what I said registered with him.  He's always been extremely polite and proficient, but, you know, I was saying things, I don't know if this thing registered with him, but I was just full of hurt when I was talking to him.

(Moosavi Dep. at pp. 223-24).

In February 2002, Moosavi went to Dr. Wu's office and complained again.  (Doc. 1 at ¶ 27).  Moosavi alleged that he asked Fisher to make an answer key for a test, and the answer key she made contained mistakes.  When the mistakes were discovered, Fisher told members of the

34

math department that Moosavi made the mistakes.  Moosavi showed Dr. Wu the answer key with Fisher's handwriting and the mistakes.  (Moosavi Dec. at ¶ 27).  Moosavi asked Dr. Wu to do something about it, but he never heard from him about it again.  (Moosavi Dec. at ¶ 27).  Moosavi felt like Dr. Wu would have treated him differently had he been from Alabama:

Q.  Did he [Wu] hold animosity against you based on your race?

MS. ROBERTSON: I think he just answered that question.

MS. LEMLEY: Based on your race.  He didn't answer my question.

A.  From the end result now that I look back I can't see any other reason.

Q.  You think Dr. Wu doesn't like you because you're Muslim?

A.  I think what Dr. Wu did he probably wouldn't do to somebody who was from Alabama and spoke southern – with a southern accent.  I truly believe that he would have listened to them, he would have done something to resolve the situation.

. . .

A.  He was.  Dr. Wu's responsibility's just totally different.  You know, if the situation is unjust, if you're under pressure, if you're being discriminated against, and you complain to your superior, if you complain to somebody who is in charge and nothing take [sic] place to relieve the situation, then you have to hold the person responsible.

(Moosavi Dep. at pp. 285-86, 288).

Before the interviews took place for the 2002 full time instructor positions, Dr. Laurie told Stanley that Moosavi had asked her to sit on his dissertation committee.  (Doc. 31 at ¶ 16).  Dr. Laurie then told Stanley she hated to do it because it would just be a "joke."  (Doc. 31 at ¶ 16).

After Moosavi did not receive an appointment letter, he attempted to find out from Dr.

Wu why he had not been offered a 2002 FTTI position.  Dr. Wu responded that the decision was the committee's and that he could not say any more than that.  (Wu Dep. at pp. 373-74; Doc. 29, Ex. 31 at p. 4).  Moosavi then asked Dr. Allen to ask Dr. Wu why he had not been selected and Dr. Wu indicated to Dr. Allen that Moosavi had made a number of math errors in his work.  (Allen Dep. at pp. 56-57).

On June 25, 2002, Moosavi met with Dr. Wu, Joe Benson, the Assistant Dean, and Dr. Allen.  (Wu Dep. at p. 372).  In the meeting, Dr. Allen urged them to reconsider hiring Moosavi and expressed his concern that Dr. Fisher's participation in the interview process was not fair and that Moosavi may have been blamed for mistakes that did not actually happen.  (Allen Dep. at pp. 60, 88-89).  Dr. Allen also told them that Fisher "frequently meddled with test preparation," and that Fisher made changes to tests resulting in mistakes and then Moosavi got the blame because he was course captain and ultimately responsible for the exams.  (Allen Dep. at pp. 62, 90-91).

On July 19, 2002, Moosavi submitted a written statement of grievances to the University[33] encompassing the complaints he makes herein.  (Doc. 29, Tab 31).  On August 7, 2002, Moosavi met with Gwen Hood of the University's Human Resources and EEO departments and complained that he received discriminatory treatment.  After Moosavi's complaint, Hood interviewed various individuals.  (Doc. 29 at Ex. 52).

### 9.  The EEOC Charge

On October 8, 2002, Moosavi submitted a Charge of Discrimination to the EEOC asserting that he was discriminated against by the University in its hiring practices because of his

---

[33]The record is unclear as to whom Moosavi submitted his grievance letter to.

36

national origin, race, and/or religion.  (Doc. 29, Tab 53).  In its response to Moosavi's charge, the University filed its position statement with the EEOC, setting forth its reasons for its decision not to hire Moosavi.  (Doc. 29, Tab 54).  The University represented to the EEOC, as it does herein, that "Ms. Queen did not participate" in the decision not to hire Moosavi.  (Doc. 29, Tab 54 at pp. 4-5).

## II.  PLAINTIFF'S MOTIONS TO STRIKE

The plaintiff has filed four motions to strike in this case.  (Doc. 25, 26, 27, and 38).  The court will address each in turn below.

Two of the plaintiff's motions to strike (doc. 25 & doc. 27) refer to the affidavit of Dr. Carol White[34] and Johnny Parker.[35]  Dr. White is the Dean of General and Related Studies at Athens Technical College.  (White Aff. at ¶ 3).  Parker is the Custodian of Records at Shelton State Community College.  (Parker Aff.).  Dr. White and Parker's affidavits and supporting documentation are offered to show that Moosavi applied for a position at Athens Technical College and Shelton State Community College and was denied the positions because he did not meet the minimum requirements for the position.  (White Aff. at ¶¶ 6-7).

There is no allegation in this case that the committee at the University relied in any way on Shelton State or Dr. White's/Athens Technical College's assessment of Moosavi in its decision not to hire him.  However, the defendant contends that its basis for producing the affidavits of White and Parker and the supporting documentation is not to support the credibility of the University's decision not to offer Moosavi a position; but, rather to show that other

---

[34]Dr. White's affidavit is located at document 19.

[35]Parker's affidavit is located at document 19.

37

reasonable employers questioned whether the plaintiff had the 18 hours of graduate-level mathematics necessary.  (Doc. 35 at pp. 2-4).  The court, however, notes that at least part of the search committee decided that since Moosavi was already performing the job and since the prior department head had hired him under similar requirements, they must have had reason to believe that he had, in fact, completed the required course work.  (Laurie Dep. at p. 64; *see* p. 10, *supra*).  As such, the court finds that the testimony and documentation offered by White and Walker are of no relevance to the committee's decision not to hire Moosavi.  The plaintiff's motions to strike the affidavits and documents in support thereof (doc. 25 and 27) are, therefore, due to be granted.  An order consistent with the court's findings will be entered contemporaneously herewith.

Next, the plaintiff moves to strike "any and all statements made by the defendant in the 'Section One: Facts' portion of his Brief Supporting the Motion for Summary Judgment [doc. 18] that are not followed by a citation to the record."  (Doc. 26).  The plaintiff argues that the defendant's failure to provide citation to each and every sentence in its brief is grounds for the court striking the "Facts" section of its brief.  The court disagrees.  The court has painstakingly reviewed the entire record in this case and has had no difficulty in locating the source for the assertions made in the defendant's brief based upon the defendant's citation to the record.  While some judges in this district require a citation after every sentence, the undersigned does not.  Where, as occurs often within the defendant's brief, a full thought is derived from a particular source, a citation to that source at the conclusion of that thought is not only entirely appropriate, but also allows for more fluid reading.[36]  The court finds the plaintiff's motion to strike the facts

---

[36]The plaintiff also argues that the defendant's facts section is due to be stricken because "to require the plaintiff to locate the evidentiary source of each of the defendant's statements in order to confirm, substantiate, and refute such statements is an undue burden on the plaintiff."  (Doc. 26 at ¶ 9).  As the court notes herein, it was able to verify the defendant's assertions based upon the citations provided in the brief.

section of the defendant's brief (doc. 26) without merit.  Therefore, it is due to be denied.  An order consistent with the court's findings will be entered contemporaneously herewith.

Finally, the plaintiff moves to strike "facts and contentions in nine pages of argument disputing whether the plaintiff can make a showing of his prima facie case of discrimination." (Doc. 38 at 2).  As grounds for his motion, the plaintiff argues that the defendant failed to argue that the plaintiff had not established a prima facie case in its initial brief and attempts to in its reply.  (*Id.*).  In support of his argument, the plaintiff notes that "[a]rguments raised for the first time in a reply brief are not properly before the reviewing court." *United States v. Oakley*, 744 F.2d 1553, 1556 (11th Cir. 1984), citing *United States v. Benz*, 740 F.2d 903 (11th Cir. 1984). (Doc. 38 at ¶ 5).

Although the court could allow the new grounds and allow the plaintiff to file a response to the new grounds (*See International Telecommunications Exchange Corp. v. MCI Telecommunications Corp.*, 892 F. Supp. 1520, 1531 (N.D. Ga. 1995)), the court finds that such would not be in the interest of judicial economy in this case.  Because the defendant has articulated legitimate business reasons for its decision not to hire Moosavi, and the court finds that the plaintiff's case is due to be dismissed regardless of whether he has established a prima facie case, judicial economy does not warrant additional briefing.  Accordingly, the plaintiff's motion to strike the defendant's reply brief to the extent it seeks to challenge the plaintiff's prima facie case is due to be granted.  An order consistent with the court's findings will be entered contemporaneously herewith.  The court has not considered anything offered by the defendant regarding the plaintiff's prima facie case in its decision herein.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b). Once the moving party has met her burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. (*Id*.).

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

40

FED. R. CIV. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

## IV.  DISCUSSION

In his complaint, the plaintiff alleges that he was subjected to a hostile work environment through inappropriate racial, ethnic, and religious comments by Queen and Fisher and that he was discriminated against in his interview because he was subjected to harsher and more restrictive guidelines and constraints than the non-middle Eastern applicants.  (Doc. 1 at ¶¶ 12, 13, 15).  Moosavi further alleges that the defendant discriminatorily failed to hire him although he was qualified to perform the job, while hiring others outside his protected class.  (Doc. 1 at ¶¶ 17 & 18).  Further, Moosavi alleges that he was "subjected to harassment, discrimination, and was denied the position based at least in part because of his race, Iranian-American; his religion, Muslim; and/or his national origin, Iranian."  (Doc. 1 at ¶ 19).  Lastly, the plaintiff alleges that the defendants subjected him "to harassment and discriminated against [him] on the basis of his race, religion, and/or national origin with respect to job assignments, hiring, and other terms, conditions, benefits, and privileges of his employment."  (Doc. 1 at ¶ 24).

Although the plaintiff seems to assert a hostile environment claim in his complaint, in his response to the defendant's motion for summary judgment the plaintiff denies that he asserts any claim for hostile work environment and asserts that his only claim is an unlawful discrimination claim in the failure to hire context.  (Doc. 33 at 101 n.29).  Accordingly, the remaining claims, to

the extent they were being asserted by the plaintiff, are due to be dismissed.

### A.  Race, Religion, and National Origin Discrimination Claims Under Title VII

To get past summary judgment, the plaintiff must present a genuine issue of material fact on his discrimination claim.  The plaintiff may establish a genuine issue of material fact through either direct evidence of discrimination or through "circumstantial evidence sufficient to allow an *inference* of discrimination."  *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) (italics in original).

Because Moosavi does not present any direct evidence of discrimination, the court must apply the familiar *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) standard.  The plaintiff must demonstrate "intentional discrimination."  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).  The Supreme Court has stated unequivocally that "[p]roof of discriminatory motive is critical" in a disparate treatment case.  *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335-36 n.15, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977).  *See also United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983); *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 528-29 (11th Cir. 1983).

The plaintiff carries the initial burden of establishing a *prima facie* case of discrimination.  *McDonnell Douglas Corp.*, 411 U.S. 792.  Under the *McDonnell-Douglas* framework, if the plaintiff establishes a *prima facie* case, a presumption is formed that the defendant discriminated against the plaintiff, and the burden then shifts to the employer to respond with a legitimate, nondiscriminatory reason for its actions.  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28

42

(11th Cir. 1997 ), *cert denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d (1998) (citing

*McDonnell-Douglas Corp.*, 411 U.S. at 802, 93 S. Ct. at 1824.  Once the defendant articulates a

"legitimate, nondiscriminatory reason" for its actions, any presumption of discrimination arising

out of the *prima facie* case "drops from the case."  *Burdine*, 450 U.S. at 255 n.10; *St. Mary's

Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).  The plaintiff

is then afforded an opportunity to demonstrate that the defendant's proffered reason was not the

true reason for the employment decision.  *Combs*, 106 F.3d at 1528.

A *prima facie* case of discrimination in a failure to hire claim may be established by

showing that the plaintiff: (1) is a member of a protected class; (2) that he sought and was

qualified for a position that the employer was attempting to fill; (3) that despite his qualifications

he was rejected; and (4) that after his rejection the employer either continued to attempt to fill the

positions or in fact filled the positions with persons outside the plaintiff's protected class.

*Silvera v. Orange County School Board*, 244 F.3d 1253, 1258 (11th Cir. 2001); *Walker v.

Mortham*, 158 F.3d 1177, 1186 (11th Cir. 1998); *Welborn v. Reynolds Metal Co.*, 810 F.2d 1026,

1028 (11th Cir. 1987).

In the instant case, as previously noted, the University initially failed to argue that the

plaintiff has not established a *prima facie* case.[37]  Instead, it skips over the *prima facie* stage of

---

[37]In its reply brief, the defendant makes the argument that the plaintiff has failed to establish a prima facie case. However, as the court noted previously, that section of the defendant's argument is stricken from the record because it is made for the first time in the defendant's reply and was not made in its initial brief in support of its motion for summary judgment. Had the defendant made a timely argument that the plaintiff failed to establish a prima facie case, the court would have agreed. The fact that the committee hired Kaddoura, a Libyan Muslim (Kaddoura Dep. at p. 42), undercuts the plaintiff's argument that its failure to hire him was based on his race, religion, or national origin.  Additionally, Abby Khalilian is Iranian and was also hired by the search committee, which would certainly undermine Moosavi's assertion that the committee's decision was based on his national origin or race.  (Khalilian Dep. at pp. 19-20).  Finally, Dr. Laurie, Dr. Wang, and Dr. Roehl, three of the four search committee members, did not know that Moosavi was from Iran or that he was Muslim at the time they made their decision. (Laurie Aff. at ¶ 6; Wang Aff. at ¶ 9; Roehl Aff. at ¶ 8).

43

the case and defends its decision not to hire Moosavi for legitimate, non-discriminatory reasons. (Doc. 18 at p. 59).  Generally, the University contends that Moosavi was not as qualified as the six individuals that the search committee ultimately selected for the positions and that Moosavi had a weak interview.  (Doc. 18 at 60-75).

In response, the plaintiff first asserts that he was never actually considered for the position because at least some of the search committee members testified that they decided to interview Moosavi only as a professional courtesy because he was a current FTTI at the time of the interviews.  In support of his argument, Moosavi cites *Joshi v. Florida State University Health Center*, 763 F.2d 1227, 1235 (11th Cir. 1985).  This court, however, finds that the facts of *Joshi* are inapplicable to the facts of the instant case.  In *Joshi*, the defendant contended that it did not consider the plaintiff because it did not realize she was an applicant for the position. *Joshi*, 763 F.2d at 1235.  The court rejected that argument, finding that the plaintiff had not withdrawn her application and that members of the selection group and other officials of the University had told her that she was to be considered for the next vacancy and also told her that she was actually being considered.  *Id*.  The court also rejected the defendant's argument that the males that were hired were more qualified then the plaintiff because "she was not considered, her qualifications were not compared to those of the male applicants and hence, the relative qualifications of those applicants cannot be a reason for the defendants' failure to hire her."  *Id*.

The court is not persuaded by this argument.  Unlike *Joshi*, in the instant case, although the committee may have not intended to interview Moosavi from the outset, once the decision to interview him was made, the evidence shows that he was considered along with the other applicants.  The committee's consideration of Moosavi is evident through the interview

44

worksheets.  (*See* UA-00314-00326, 00329-332).

Once the defendant has articulated its legitimate reason for the plaintiff's termination, the court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct." *Combs*, 106 F.3d at 1538 (citing *Cooper-Houston v. Southern Ry. Co*., 37 F.3d 603, 605 (11th Cir. 1994)).  This must include an evaluation of "whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence." *Combs*, 106 F.3d at 1538.  If it is "determine[d] that a reasonable jury could conclude that the employer's" articulated reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the plaintiff's prima facie case taken together with rejection of the employer's explanations for its action." *Id.*  The plaintiff "cannot prove pretext by asserting baldly that [he] was better qualified than the person who received the position at issue." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1090 (11th Cir. 2004).  Instead, the plaintiff

> must adduce evidence that the disparity in qualifications was "so apparent as virtually to jump off the page and slap you in the face." . . . For the discrepancies to "jump off the page and slap you in the face," they must be of such weight and significance that no reasonable person could have chosen [the candidate hired] over [the plaintiff]. . . . This Court must not "judge which employee was more qualified . . . but determine whether any disparity . . . is so great that a reasonable fact-finder could infer that [the employer] did not believe that [the candidate hired] was better qualified." . . . .

(*Id.*).

In evaluating whether the plaintiff has demonstrated pretext, the court must examine each of the proffered "legitimate reasons" for the employment decision and determine whether the plaintiff has cast sufficient doubt on each to permit a reasonable fact finder to conclude that the purported "legitimate reasons were not what actually motivated its conduct." *Combs*, 106 F.3d at 1538-39. *See Mora v. University of Miami*, 15 F. Supp. 2d 1324, 1336 (S.D. Fla. 1998) (A plaintiff, nevertheless, can survive summary judgment by presenting evidence demonstrating a genuine issue of material fact as to the truth or falsity of each of the employer's legitimate, nondiscriminatory reasons), citing *Evans v. McClain of Georgia, Inc.*, 131 F.3d 964-65 (11th Cir. 1997) (citing *Combs*, 106 F.3d at 1530-32).

In the instant case, the University premises its decision not to hire Moosavi on the fact that the candidates hired over him were better qualified. Specifically, the defendant points out that four of the candidates chosen over Moosavi (Steiner, Kennedy, Ponta, and Kaddoura) had master's degrees in Mathematics, which was preferred by the Department. (Doc. 18 at 61). According to the University, the other candidates that were selected held degrees similar to Moosavi's, but had stronger math backgrounds than did Moosavi. (*Id*.). Although one candidate (Glass) had a math background comparable to Moosavi's, the committee felt that her teaching experience and experience in leadership roles exceeded Moosavi's. (Laurie Aff. at ¶¶ 15-16; Wu Aff. at ¶ 9; Wang Aff. at ¶ 6; Roehl Aff. at ¶ 5).[38]

Additionally, the committee was concerned about Moosavi's qualifications because of problems he experienced during his four years as an FTTI. (Doc. 18 at p. 63). Based upon

---

[38]On pages 19-24 of the defendant's reply brief (doc. 36) it sets out the relative qualifications of the candidates. Based upon that showing as well as the testimony of the committee, this court is not convinced that no reasonable employer could have concluded that Moosavi was less qualified than the applicants that were recommended over him. *See Wilson*, 367 F.3d at 1087.

information provided to the search committee through Queen, the search committee was aware that Moosavi procrastinated and was often late in getting exams to proofreaders; neglected to turn in course statistics and ran behind in preparing syllabi for Math 121; and repeatedly wrote exams that had conceptual errors that led to misleading test questions.  (Queen Dep. at pp. 115, 119-20; Laurie Aff. at ¶ 11; Queen Aff. at ¶¶ 35, 37).

The committee also felt that Moosavi's interview was weaker than the candidates selected.  (Doc. 18 at p. 64).  Specifically, the University argues that "how well or poorly an applicant performs during an interview has become an increasingly significant factor in whether or not he is offered the position."  (Doc. 18 at 64 *citing Chapman v. AI Transport*, 229 F.3d 1012, 1034 (11th Cir. 2000)).  Both Dr. Roehl and Dr. Laurie concluded that Moosavi's interview was the weakest among the applicants.  Dr. Laurie specifically noted that Moosavi made conceptual errors on two of the problems he presented to the committee and relied on his notes more than she thought he should have.  (Laurie Aff. at ¶¶ 13, 20; Roehl Aff. at ¶ 6).

In response, Moosavi argues that each of the University's proffered legitimate reasons for its decision are pretext for unlawful discrimination.  (Doc. 33 at 54).  Moosavi relies on his past employment with the University and the fact that he was never disciplined or counseled for his work performance as evidence that he was more qualified for the position than the other candidates.  (Doc. 33 at pp. 55-56).  The plaintiff further argues that in the failure to hire context, pretext may be evidenced by the plaintiff's higher level of qualifications than the individual or individuals actually selected for the position at issue.  (Doc. 33 at 59).  In support of that contention, the plaintiff offers the following:

both the Supreme Court and this court have observed that evidence showing an

47

employer hired a less qualified applicant over the plaintiff **may be probative of whether the employer's proffered reason for not promoting plaintiff was pretextual.** *See Walker v. Mortham*, 158 F.3d 1177, 1190 (11th Cir. 1998) ("'The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination.'") (quoting *Burdine*, 450 U.S. at 258-59, 101 S. Ct. 1089). *See also Taylor*, 175 F.3d at 868 (Stating that evidence of plaintiff's superior experience "would permit a jury to disbelieve" that the employer actually relied on the chosen candidate's experience when it promoted him).

(Doc. 33 at p. 60 (quoting *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1340 (11th Cir. 2000)(emphasis added)). The plaintiff goes further to say that the proper analysis for the court to undertake in making such a determination is set forth in *Thomas v. Troy City Bd. of Education*:

The evidentiary standard in the Eleventh Circuit Court of Appeals, where claims of discrimination in hiring are based on evidence that the plaintiff was more qualified than the individual hired, is clear: "[W]here a claim of discrimination is based on relative qualifications, 'disparities in qualifications are not enough in and of themselves to demonstrate discriminatory intent unless those disparities are so apparent as to virtually jump off the page and slap you in the face.'" *Hall v. Alabama Assoc. of Sch. Bds.*, 326 F.3d 1157, 1175 (11th Cir. 2003) (quoting *Deines v. Texas Dept. of Protective and Regulatory Servs.*, 164 F.3d 277, 280 (5th Cir. 1999)). The court finds that the plaintiff's subjective belief that his performance was satisfactory and that his misconduct was justified is insufficient to overcome the defendant's proffered legitimate reason for his termination. The plaintiff's discrimination claim is, therefore, due to be dismissed.

302 F. Supp. 2d 1303, 1308-09 (M.D. Ala. 2004). (Doc. 33 at p. 60).

The plaintiff argues that this case is one in which the disparity in qualifications "literally 'jumps off the page and slaps you in the face.'" (Doc. 33 at p. 60). In comparing himself to the others selected, the plaintiff focuses on the number of years he was a GTA, PTTI, and FTTI, as well as the degrees he obtained. What the plaintiff fails to adequately take into account is the quality of the "math" hours he obtained, as well as the department's preference for candidates with advanced degrees in Mathematics instead of Education.

48

Even if the plaintiff was as qualified on paper as some of the other applicants, the disparity is far from one that would "jump off the page and slap you in the face" as is required to overcome the defendant's motion for summary judgment.

The plaintiff further argues that pretext is evident because

the defendant's proffered explanation of what criteria actually constituted the ultimate "qualifications" necessary for the FTTI position has under gone a continual metamorphosis from the beginning of the defendant's selection process for the FTTI positions to its submission for summary judgment.  Initially, the decisive qualifications for the FTTI positions were enunciated by Dr. Wu in the Final Selection Reports . . . [as] "The recruiting committee selected the eight strongest candidates among those who applied for the position, based on their education and experience teaching student [sic] in the higher education arena."

(Doc. 33 at p. 66).  What the plaintiff fails to recognize is that at the time the committee was making hiring recommendations to the Dean and documenting its decisions, it was not defending a lawsuit.  It appears that the committee used very general language to express to the Dean that the suggested candidates met the minimum qualifications.  They were not required to do more than they did.  The fact that the committee's reasoning and decision making is so much more evolved is a consequence of this litigation, particularly the discovery process.  Since the committee stated its conclusory findings, the parties have exchanged thousands of pages of documents and conducted numerous lengthy depositions.  Under these circumstances, the defendant cannot be faulted for articulating its reasons for the decisions in a more detailed manner.

Additionally, as the plaintiff points out, the grounds given to the Dean by the committee when it was recommending the candidates were the "minimum qualifications" set out in the PRNP advertising the position.  (Doc. 33 at p. 66).  However, the "minimum qualifications" were

just that - - minimum qualifications.  The candidates had to at least meet those qualifications.

The fact that Moosavi met the minimum qualifications does not entitle him to a position on the

recommended list submitted to the Dean.

In a further attempt to establish that the defendant's legitimate reasons for not hiring

Moosavi are pretext, Moosavi asserts that Wu would not give him a reason for not hiring him,

saying that he had to protect himself.  (Doc. 33 at p. 67).  Additionally, he notes that Dr. Joe

Benson told him there were no criteria used by the committee in making its decision.[39]

However, after Moosavi filed his Charge with the EEOC, the defendant expounded on its reasons

for not hiring Moosavi in its Employer's Position Statement.  (*Id*.).  The plaintiff implies that the

defendant's reasons are false because they "expanded."  (*Id*.).  In its Position Statement to the

EEOC, the University replied:

> Some of the search committee members questioned whether Mr. Moosavi
> understood some math concepts, and some questioned whether his math
> background was as strong as that of the other applicants.  Mr. Moosavi's
> repetitive problems performing the course captain portion of his job was also of
> major concern to the individual members of the search committee.  Based on a
> review of the applicants, the information known about the applicants, and the
> presentations in the interview process, the committee concluded that Mr. Moosavi
> and another current full-time temporary instructor, Michael Hicks (a white male
> U.S. citizen) were unacceptable for the [FTTI] course captain responsibilities and
> were not as qualified as the other applicants for these particular instructor
> positions.
>
> . . .
>
> . . .
>
> . . . Mr. Moosavi was not selected for the position of [FTTI] based on his

---

[39]If Benson was involved in the decision-making process, the court is unaware of his involvement from the record. The record shows that what Benson actually told the plaintiff was that there were no "written criterion, procedure[s], or guidelines regarding the inner workings of this committee."  (Doc. 29, Ex. 31 at 1).

problems performing adequately in the course captain role, based on the interview process, and based on the search committee's assessment that the persons chosen for the position had qualifications superior to those of Mr. Moosavi's for the course captain role. . . .

. . .

. . . Mr. Moosavi was not selected for the new appointment because he was not among the best qualified applicants.

(Doc. 29, Ex. 54 at pp. 4-6).

Although the plaintiff attempts to argue that the defendant has presented "shifting reasons" for its decision not to re-hire Moosavi, the court disagrees. Rather than offer "shifting reasons," the defendant has simply expounded on the basic reasons as this situation has evolved from a decision not to hire an individual to the defense of a discrimination law suit. For instance, one interviewer's notes from the interviews references the "18 hour question" regarding Moosavi's qualfiicaitons and the fact that some of the courses he took were "really undergrad[uate]" courses. (Doc. 21, Part I, UA-00326). Another set of notes mentions that his qualifications were "below average," that he needed his notes during the presentation,[40] and there was some question concerning the clarity of the presentations, and that he needed to provide more detail concerning his explanations. (*Id.* at UA-00314).

The Eleventh Circuit addressed the "shifting reasons" issue in *Cleveland v. Home Shopping Network*, 369 F.3d 1189 (11th Cir. 2004). In that case, the employer not only offered shifting reasons for the plaintiff's termination, but the plaintiff was also able to introduce

---

[40]The writer did further note, however, that this may be attributable to nervousness. (Doc. 21, Part I, UA-00314).

evidence that the array of reasons offered were bogus.[41]  Such is not the case here.  Instead, the

University has offered reasons why it determined that the other candidates were better qualified

for the position than Moosavi and, aside from his differing opinion, Moosavi has not offered any

sufficient evidence to show that the University's reasons are pretext.

The plaintiff also contends that the University's second reason for not hiring him - - his

weak interview - - is also pretext.  (Doc. 33 at p. 76).  Citing *Chapman v. AI Transport*, 229 F.3d

1012, 1033 (11th Cir. 2000), the plaintiff acknowledges that "[a] subjective reason can constitute

a legally sufficient, legitimate, nondiscriminatory reason under the *McDonnell Douglas/Burdine*

analysis."  However, the plaintiff argues that the defendant has failed to provide the court with a

clear and reasonably specific reason for its decision not to hire him.  In *Chapman*, the Eleventh

Circuit stated:

> we are mindful of the requirement articulated by the Supreme Court in *Burdine*
> that "the defendant's explanation of its legitimate reasons must be clear and
> reasonably specific" so that "the plaintiff be afforded a full and fair opportunity to
> demonstrate pretext."  *Burdine,* 450 U.S. at 258, 101 S. Ct. at 1096 (quotation
> omitted).  A subjective reason is a legally sufficient, legitimate, nondiscriminatory
> reason if the defendant articulates a clear and reasonably specific factual basis
> upon which it based its subjective opinion.  Continuing our example of a sales
> clerk or wait staff position, it might not be sufficient for a defendant employer to
> say it did not hire the plaintiff applicant simply because "I did not like his
> appearance" with no further explanation.  However, if the defendant employer
> said, "I did not like his appearance because his hair was uncombed and he had
> dandruff all over his shoulders," or "because he had his nose pierced," or "because
> his fingernails were dirty," or "because he came to the interview wearing short
> pants and a T-shirt," the defendant would have articulated a "clear and reasonably
> specific" basis for its subjective opinion--the applicant's bad (in the employer's

---

[41]The employer in *Cleveland* alleged that the plaintiff was terminated for her participation in an infomercial because her contract forbid infomercials; "she had signed a non-compete agreement;" "HSN had an 'unwritten policy' prohibiting infomercials; and, it was "'standard industry practice' that show hosts should not do infomercials."  *Cleveland*, 369 F.3d at 1192. The plaintiff, however, was able to produce evidence that all of these reasons were bogus because "she was not under contract; the non-compete agreement was no longer valid; and no other employee had ever been made aware of an unwritten policy or industry practice prohibiting infomercials."  *Id.*  She was also able to produce evidence that two other show hosts had been given permission to do infomercials.  *Id.*

view) appearance.  That subjective reason would therefore be a legally sufficient, legitimate, nondiscriminatory reason for not hiring the plaintiff applicant.

*Chapman*, 229 F.3d at 1033.

Much like the example given in *Chapman*, the University offers specific examples of how Moosavi's interview was weak: he used his notes more than should have been necessary; he made conceptual errors in his explanation of the problems; he failed to project confidence in his delivery of the material; and he failed to acknowledge the conceptual errors that he made. (Laurie Aff. at ¶¶ 13, 20).[42]  These examples are consistent with the notes from the interviews.  In light of these specific examples of Moosavi's weak interview, the court finds that the University explained "the grounds for their evaluation with reasonable clarity and specificity."[43]  The court

---

[42]The court notes that each evaluator's perception of an interview is subjective.  As Dr. Wu testified in his deposition:

[O]ur goal is to hire the best instructor from the pool.  And . . . we have minimal requirements that we lay out on the ads and then each individual they have their own judgment [sic].  I don't want to dictate the process.  I just want the other committee members to make their own best judgment.

(Wu Dep. at pp. 186-88).  As stated previously, a subjective opinion is okay.

. . . . Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules.  "*Title VII addresses discrimination.  Ferguson v. Veterans Administration,* 11th Cir. 1984, 723 F.2d 871, 872.  "Title VII is not a shield against harsh treatment at the workplace."  *Jackson v. City of Kileen,* 5th Cir. 1981, 654 F.2d 1181, 1186.  Nor does the statute require the employer to have good cause for its decisions.  The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.  *Megill v. Board of Regents,* 5th Cir. 1976, 541 F.2d 1073, 1077; *Sullivan v.Boorstin,* 1980, D.D.C., 484 F. Supp. 836, 842.  "While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination.  The employer's stated legitimate reason . . . does not have to be a reason that the judge or jurors would act on or approve."  *Loeb v. Textron, Inc.,* 1st Cir. 1979, 600 F.2d 1003, 1012 n.6.

*Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181 (11th Cir. 1984).

[43]The plaintiff argues that the "disparate treatment of [him] during the interview process, as set out in the plaintiff's Statement of Facts herein, is evidence that the defendant's reliance upon the plaintiff's 'weak interview' is mere pretext for discrimination as the selection committee conducted the interview process and evaluation in a discriminatory and disparate manner.  The defendant's basis for the non-selection of the plaintiff based upon his interview focuses solely on the initial portion of the interview, i.e., the problem portion of the interview in which Queen and Fisher participated."  (Doc. 33 at 77).  The plaintiff's argument, however, is fatally flawed.  The evidence in this case indicates that each and every applicant went through the exact same interview process.  Not a shred of evidence reveals that Queen and Fisher were not present for the problem portion of every interview.  As such, Moosavi simply cannot show that he received disparate treatment during the interview process.  The court is likewise not convinced that Moosavi was treated disparately when he was not allowed to use the overhead projector because, again, the evidence shows that no one used an overhead projector.  Based upon the record, the court cannot

53

finds the plaintiff's challenge to be without merit.[44]

### B.  The Impact of Queen and Fisher

The plaintiff next argues that Queen and Fisher held a discriminatory animus towards

him and that their animus played a part in the search committee's decision-making process.

(Doc. 33 at pp. 92-101).  Assuming for the sake of argument that Queen and Fisher did harbor a

discriminatory animus towards Moosavi, neither Queen nor Fisher were decision-makers as

provided for in the law.

The plaintiff argues, however, that the search committee was merely the "cat's paw" of

Queen and/or Fisher.  (Doc. 33 at p. 94).  Specifically, the plaintiff argues:

> Even in a situation where the individual with a discriminatory motive is not the
> ultimate decision maker, the plaintiff may show that a decision maker acted in
> accordance with the discriminator's decision without evaluating the decision then
> pretext may be shown.  Curtis v. Teletech Customer Care Management, Inc., [288
> F. Supp. 2d 1231] (N.D. Ala. 2002).  In such circumstances the recommending
> discriminator is the de facto decision maker and is using the ultimate decision
> maker as a conduit or "cat's paw" to give effect to the discriminatory animus.  Id.

(Doc. 33 at p. 95).  The "cat's paw" theory has probably best been articulated in this circuit by

the court in *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236 (11th Cir. 1998), *cert. denied*,

528 U.S. 930, 120 S. Ct. 327, 145 L. Ed. 2d 255 (1999).  There, the court stated:

> Several courts have held that even when the harasser in a Title VII case is not the
> decisionmaker, if the plaintiff shows that the harasser employed the
> decisionmakers as her "cat's paw" - - *i.e.*, the decisionmaker acted in accordance
> with the harasser's decision without herself evaluating the employee's situation,

---

ascertain that Moosavi attempted to use the marbles and was not allowed - - only that he was not allowed to use the overhead projector.

[44]The plaintiff offers eight pages of testimony from Dr. Wu's deposition that provides nothing more to the court than the plaintiff's attorney's argument that because someone has done a job for four years, that person is necessarily capable of doing the job.  While that may be true, whether a person has done a job for four years or even longer does not make him the most capable of performing the job out of a pool of qualified applicants.

> see *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) - - causation is
> established.  *See, e.g., Long v. Eastfield College*, 88 F.3d 300, 307 (5th Cir. 1996)
> ("If . . . . [the decisionmaker] did not conduct his own independent investigation,
> and instead merely 'rubber stamped' the recommendations of [those who held a
> discriminatory animus], the causal link between [the plaintiffs'] protected
> activities and their subsequent termination, would remain intact.").  In a "cat's
> paw" situation, the harasser clearly causes the tangible employment action,
> regardless of which individual actually signs the employee's walking papers.  *See
> Shager*, 913 F.2d at 405. . . .  In effect, the harasser is the decisionmaker, and the
> titular "decisionmaker" is a mere conduit for the harasser's discriminatory animus.

*Llampallas*, 163 F.3d at 1249.  Much like the Eleventh Circuit found in *Llampallas*, the instant
case is not a "cat's paw" case.  There is no evidence that the committee's decision not to hire
Moosavi was "simply a tacit approval of [Queen and/or Fisher's] own decision to do the same."
*See id.*  There is also no evidence that Queen and/or Fisher recommended that the committee take
action against Moosavi.

Taken in a light most favorable to the plaintiff, the evidence shows that Queen and/or
Fisher made discriminatory comments to Moosavi and that Queen communicated her opinion
about Moosavi and his work to the committee.  The court is cognizant that Queen's impressions
of Moosavi likely played into the committee's opinion about Moosavi.  However, there is no
evidence that Queen's impressions had anymore impact than that.

Regardless of Queen and/or Fisher's opinions, the committee granted Moosavi an
interview and considered him along with the other applicants.  Even had Queen and/or Fisher
recommended that the committee not hire Moosavi because of their distaste for him premised on
his race, religion, or national origin,[45] the fact that the committee did an independent review of
Moosavi before deciding not to hire him would except this case from a "cat's paw" situation.

---

[45]The court does not suggest, and does not believe, that this is the case.

*See Llampallas*, 163 F.3d at 1249 ("This meeting suffices to except this case from the cat's paw line of cases. *See Willis v. Marion County Auditor's Office*, 118 F.3d 542, 547 (7th Cir. 1997) (excepting from the 'cat's paw' line a case in which the decisionmaker investigated a subordinate's motives by meeting with the plaintiff before acting on the subordinate's adverse recommendations)").[46]

Based upon the foregoing, the court cannot conclude that the committee of four tenured professors was nothing more than Queen and/or Fisher's "cat's paw." As such, the defendant's motion for summary judgment is due to be granted.

## V.  CONCLUSION

Upon consideration, the court finds that the defendant's motion for summary judgment (doc. 17) is due to be granted. The plaintiff's motions to strike the affidavits of White and Parker (doc. 25-26) and a portion of the defendant's reply brief challenging the plaintiff's *prima facie* case (doc. 38) are due to be granted. The plaintiff's motion to strike the defendant's factual statement (doc. 27) is due to be denied. An order consistent with this court's findings will be entered contemporaneously herewith.

The Clerk of the Court is **DIRECTED** to serve a copy of this memorandum opinion upon counsel of record.

**DONE**, this 25th day of  March, 2005.

*John E. Ott*

**JOHN E. OTT**
United States Magistrate Judge

---

[46]Furthermore, at least three of the committee members did not know that Moosavi was from Iran or Muslim, and, therefore, could not reasonably have known that Queen and/or Fisher were motivated by a discriminatory animus towards him. (Laurie Aff. at ¶ 6; Wang Aff. at ¶ 11; and Roehl Aff. at ¶ 11).